**DENTONS US LLP**
PAUL ALSTON            1126
LOUISE K. Y. ING       2394
1001 Bishop Street, Suite 1800
Honolulu, Hawai`i  96813
Telephone: (808) 524-1800
Facsimile: (808) 524-4591
E-mail:   paul.alston@dentons.com
          louise.ing@dentons.com

**ARNOLD & PORTER KAYE SCHOLER LLP**
ANAND AGNESHWAR *(Pro Hac Vice pending)*
250 West 55th Street
New York, NY  10019-9710
Telephone: (212) 836-8000
Facsimile:  (212) 836.8689
Email:   Anand.Agneshwar@arnoldporter.com

DANIEL PARISER *(Pro Hac Vice pending)*
ROBERT N. WEINER *(Pro Hac Vice pending)*
SALLY L. PEI *(Pro Hac Vice pending)*
601 Massachusetts Avenue NW
Washington, DC  20001-3743
Telephone: (202) 942-5000
Facsimile: 202.942.5999
Email:   Daniel.Pariser@arnoldporter.com
         Robert.Weiner@arnoldporter.com
         Sally.Pei@arnoldporter.com

*Attorneys for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| BRISTOL-MYERS SQUIBB COMPANY, SANOFI-AVENTIS U.S. LLC, SANOFI US SERVICES INC., formerly known as SANOFI- | Civil Action No.<br><br>**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

AVENTIS U.S. INC., and SANOFI-
SYNTHELABO INC.,

            Plaintiffs,

    vs.

CLARE E. CONNORS, in her official
capacity as the ATTORNEY
GENERAL OF THE STATE OF
HAWAI‛I,

            Defendant.

---

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Bristol-Myers Squibb Company ("BMS") and Sanofi-Aventis U.S.

LLC, Sanofi US Services Inc., and Sanofi-Synthelabo LLC (collectively "Sanofi"

and, with BMS, the "Companies") allege as follows:

## __INTRODUCTION__

1.     The State of Hawai‛i has sued the Companies, seeking to punish them

with massive civil penalties for failing to make the controversial, untrue statements

that their life-saving cardiovascular drug, Plavix (clopidogrel), is less effective for

Asian and Pacific Islander patients and that doctors should genetically test those

patients before prescribing the drug.  It is not just the Companies who believe these

statements to be untrue; the scientific consensus strongly supports the Companies.

2.      Hawai`i's effort to compel the Companies to parrot the State's contrary position violates the First Amendment.  To justify an effort to compel protected speech, the State must satisfy heightened scrutiny by showing that the intrusion on free speech is narrowly tailored to serve a compelling state interest, or, at minimum, that it directly advances an important government interest and is no more extensive than necessary to do so.  Here, what the Companies choose to say—or *not* to say—about their product is protected speech.  *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 576 (2011).  The compelled speech at issue, moreover, is not "purely factual and uncontroversial."  *NIFLA v. Becerra*, 138 S. Ct. 2361, 2372 (2018) (quoting *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626, 651 (1985)).  *See generally NIFLA*, 138 S. Ct. 2361 (bolstering and clarifying protections against compelled speech).  To the contrary, the State's lawsuit effectively compels the Companies to espouse scientific conclusions with which they steadfastly disagree.  And in seeking to compel and punish this speech in an area of scientific controversy, the State discriminates based on the speaker (targeting only pharmaceutical companies) as well as the content of the speech and the viewpoint expressed (that Plavix is not safe and effective for patients of all races).  *See, e.g.*, *Sorrell*, 564 U.S. at 562-66.  Heightened scrutiny therefore applies, and the State cannot meet its burden under that standard.

3

3.      Hawai`i's lawsuit to extract civil penalties from the Companies is plainly an effort to compel speech on issues of significant scientific controversy. Indeed, it goes further and attempts to compel statements that the Companies believed are scientifically baseless.  The thrust of Hawai`i's claim is that the Companies should have warned that Plavix is not effective or is less effective in patients with particular genetic traits (so-called "poor metabolizers"), that Asians are disproportionately poor metabolizers, and that genetic tests should be used to identify patients who have those traits.   In 2010, the U.S. Food and Drug Administration ("FDA") required language describing the hypothesis to be added to the Plavix label.  Yet in this case, the State claims that this hypothesis should have been added to the label more than a decade earlier, when there was absolutely no evidence linking poor metabolism to poor clinical outcomes.  It asserts that every Plavix label without that warning from 1998 until 2010 was false or misleading, and therefore claims the Companies owe the State a civil penalty of $10,000 for every Plavix prescription made in the State of Hawai`i during that time under its Unfair or Deceptive Acts or Practices statute ("UDAP").  These civil penalties manifestly seek to coerce the Companies to parrot the State's view, and therefore constitute state action to compel speech.

4.      The State's expert reports make clear that it also faults the Companies for not making statements far broader and more categorical than what is in the FDA's

label—that the drug is nothing more than a placebo for poor metabolizers and that Asians should be genetically tested before being given Plavix.

5.      The State has made inflammatory, racially-targeted claims regarding hazards to patients.  The State says in its UDAP complaint that "Plavix has diminished or no effect on approximately 30% of the patient population," "that those patients for whom Plavix would not work could be identified through a simple genetic test," that "[f]or such patients, Plavix does not prevent heart attacks, strokes, or vascular death," and that it "presents a considerable risk of gastrointestinal bleeding and other complications."  Second Am. Compl. ¶ 2, *State ex. rel. Connors v. Bristol-Myers Squibb Co.*, No. 14-1-0708-03 DEO (Haw. Cir. Ct. Dec. 4, 2018). The Hawai`i Attorney General asserted at a press conference on the filing of the enforcement action that, "[f]or a very significant portion of our population, the drug had no effect," *State Sues Maker of Plavix for Misleading Marketing in Hawaii*, Hawaii News Now, https://www.hawaiinewsnow.com/story/25021441/hawaii-attorney-general-sues-drug-manufacturers/ (last updated July 9, 2014), and later told the press that Plavix was "essentially a placebo," Rafi Letzter, *White-Dominated Medical Studies Put U.S. Minorities at Risk*, Pop. Sci. (Sept. 17, 2014), https://www.popsci.com/article/science/white-dominated-medical-studies-put-us-minorities-risk.  The State has accused the Companies of a "decades-long scheme to suppress" Plavix's supposed "dirty little secret: it had a diminished effect on Asians,

including patients of East Asian and Pacific Island descent."   Opposition to Defendant Sanofi's Motion To Dismiss for Lack of Personal Jurisdiction, State ex rel. Connors v. Bristol-Myers Squibb Co., No. 14-1-0708-03 DEO (Haw. 1st Cir. Ct. Apr. 25, 2019).

6.     The State's expert witnesses have echoed these assertions in their reports, served on December 29, 2019.  For example, Dr. Paul Gurbel claims that the Companies engaged in "active suppression and deliberate neglect of the data" regarding alleged genetic variability of response to Plavix, and that "the administration of a drug that was effectively a placebo caused an unnecessary financial cost to society."  Expert Report of Paul Gurbel, MD (Dec. 29, 2019), *State ex rel. Connors v. Bristol-Myers Squibb Co.* No. 14-1-0708-03 DEO (Haw. Cir. Ct.), at p. 52 ("Gurbel Expert Report").

7.     None of these statements by the State, its officials, or its experts is correct.

8.     When FDA added the hypothesis to the label in 2010 and suggested that genetic testing be considered, it was controversial.  Prominent members of the cardiology community criticized FDA's actions as premature.  And today, the medical consensus, as reflected in all of the leading treatment guidelines issued by organizations such as the American College of Cardiology and the American Heart Association, continues to endorse Plavix as first-line therapy, has never

6

recommended prescribing Plavix based on race or ethnicity, and continues to reject routine genetic testing.

9.      In fact, a growing body of evidence shows that Plavix works as well if not better for patients of Asian descent than other antiplatelet medications.  Plavix remains the prescription antiplatelet of choice in Asian countries.  And in 2016, FDA removed the language from the label suggesting that poor metabolizers of Plavix have worse clinical outcomes.[1]

10.     After the State filed its lawsuit in 2014, cardiologists at Hawai`i's largest hospital system were so concerned about the State's theory that they published an article rejecting the premise of the UDAP lawsuit and urging doctors to prescribe antiplatelets based on clinical efficacy and not genetics.

11.     The warning that the State demands therefore is not "factual and uncontroversial" speech.  That warning espouses, at the very best, a minority view in the scientific community even today.  And it was entirely bereft of support in 1998, when the State asserts the Companies should have first made the warning.  To compel the Companies to take a position in a scientific debate that they believe

---

[1] *Compare* March 2010 Plavix label, at 1, 3,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/020839s042lbl.pdf,
*with*  September 2016 Plavix label, at 1, 3,
https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020839s062s064lbl.pdf.

US_Active\113990389\V-1

unsupported by the evidence, the State must (among other things) show an important government interest.

12.    The State cannot meet that burden.    Fact and expert discovery powerfully corroborates that Hawai`i's UDAP lawsuit serves *no* legitimate, health-related government interest.  Despite the State's lawsuit, all of the State's Medicaid providers continue to reimburse for Plavix without regard to race or ethnicity and do not require genetic testing prior to prescribing the drug.

13.    What is more, it appears that the State's responsible health officials never voiced any concern whatsoever about Plavix's effect in patients who have particular genetic traits or racial or ethnic backgrounds.  When State Medicaid officials were deposed in August 2019, none recalled any concerns about Plavix.  The former medical director of the State Medicaid program could remember no discussion of issues with Plavix.  The current medical director of the State Medicaid program, who has held that position since 2011, likewise remembered no discussion of issues with Plavix, and could not identify any steps he took to advise doctors or patients about purported concerns regarding Plavix.

14.    Similarly, the State's expert reports include no cardiologist from Hawai`i, no cardiologist from any Asian country, no evidence that any doctor in Hawai`i ever voiced concern about the genetic issue or changed their prescribing behavior in any way, and no evidence that anyone in Hawai`i was actually harmed.

8

15.     Instead of supporting a genuine state interest, this suit appears to have been generated to achieve private financial gain.  It was devised and marketed by private contingency-fee lawyers who are litigating it at no cost to the State.  The State's main expert is participating as a qui tam relator in a suit regarding genetic variability of response to Plavix in New Jersey federal court—a potentially lucrative engagement that expert has failed to disclose in the UDAP litigation.  The UDAP complaint reflects no investigation by the State of Hawai`i but simply copies the substance of other complaints filed elsewhere.

16.     In a traditional enforcement matter, when Hawai`i's Attorney General or one of her assistants sues on behalf of the State, they have a professional and ethical obligation as government employees to serve the public interest—not necessarily to win the case, but rather to pursue actions that are a sound use of public resources and to see that justice is done.  In this case, the private lawyers hired by the State are not dedicated to the public interest.  Instead, the higher the verdict, the more the lawyers make—creating an overpowering incentive to maximize the monetary award, without regard to the larger public interest, the medical consequences, or the constitutional values that constrain State action.  The weakening of these restraints heightens the risk to First Amendment rights.

17.     Hawai`i's lawsuit not only violates the Companies' First Amendment rights, but threatens to significantly chill their protected speech.  Because the

9

Companies did not adopt and propagate the State's controversial and unproven hypothesis, they face a looming trial in April 2020 at which the State will seek billions of dollars in penalties. The prospect of this massive liability for making truthful statements about their products and for failing to make untruthful statements has a chilling effect on the speech not only of the Companies, but of other pharmaceutical manufacturers as well. The chilling effect inflicted by the State's UDAP lawsuit is exacerbated by the inflammatory and divisive rhetoric used by the State's lawyers.

18.     For companies under this type of assault, being right on the science does not alleviate the uncertainty of the process and the attendant chilling effect on speech. *See Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 349 (1974) ("The largely uncontrolled discretion of juries to award damages where there is no loss unnecessarily compounds . . . [the risk of] inhibit[ing] the vigorous exercise of First Amendment freedoms.").

19.     The State seeks to impose these massive liabilities without showing that anyone in Hawai`i was harmed, and the UDAP statute requires no such showing. The Supreme Court in *Gertz* held that the First Amendment does not permit such liability for protected speech absent a showing of injury, or malice, which the UDAP statute also does not require.

20.     In sum, the State's lawsuit violates the First Amendment and must be stopped.

## PARTIES

21.     Plaintiff Bristol-Myers Squibb Company is a pharmaceutical company incorporated in Delaware and headquartered in New York.  The State of Hawai`i, through contingency fee counsel, has brought a civil enforcement action under Hawai`i's UDAP statute against BMS.

22.     Plaintiff Sanofi-Aventis U.S. LLC is a Delaware limited liability company headquartered in New Jersey.  The State of Hawai`i, through contingency fee counsel, has brought a civil enforcement action under Hawai`i's UDAP statute against Sanofi-Aventis U.S. LLC.

23.     Plaintiff Sanofi US Services Inc., formerly known as Sanofi-Aventis U.S. Inc., is a Delaware corporation headquartered in New Jersey.  The State of Hawai`i, through contingency fee counsel, has brought a civil enforcement action under Hawai`i's UDAP statute against Sanofi US Services Inc.

24.     Plaintiff Sanofi-Synthelabo LLC is a Delaware limited liability company headquartered in New Jersey.  The State of Hawai`i, through contingency fee counsel, has brought a civil enforcement action under Hawai`i's UDAP statute against Sanofi-Synthelabo LLC.

25.     Defendant Clare E. Connors is the Attorney General of the State of Hawai`i.  She is sued in her official capacity.

US_Active\113990389\V-1

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over this action under 28 U.S.C. § 1331, which confers original jurisdiction on federal district courts over actions arising under the Constitution or laws of the United States.  This case arises under the First Amendment of the Constitution, made applicable to the State by the Due Process Clause of the Fourteenth Amendment, and under 42 U.S.C. § 1983.

27.     Venue is proper in this Court under 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to the claim occurred in this District.  Specifically, the State is pursuing its UDAP action, which arises under Hawai`i state law, in Hawai`i state court.

## FACTUAL BACKGROUND

### A.      Background on Plavix and Genetic Variability of Response

28.     Cardiovascular disease is the leading cause of death in Hawai`i, causing almost 4,000 deaths per year in that State alone.  The Companies developed Plavix— an antiplatelet therapy, *i.e.*, a blood thinner—as a revolutionary drug to treat cardiovascular disease.

29.     Plavix has been successfully launched in the United States and more than 100 countries, including China, India, Indonesia, Japan, Malaysia, the Philippines, and Singapore.  Today, Plavix is one of the most widely prescribed antiplatelets in the world, including Asia, and the medical community almost universally considers the drug safe and effective.

12

30.    In 1997, FDA approved Plavix as safe and effective for use as a "monotherapy" (*i.e.*, without another drug) to treat patients who suffered a recent heart attack or stroke or have been diagnosed peripheral arterial disease.  Five years later, FDA approved Plavix for "dual antiplatelet therapy" with aspirin for the treatment of patients with particular types of acute coronary syndrome.  FDA expanded this dual therapy approval in 2006.

31.    Dual therapy of Plavix with aspirin has been the standard of care for many years, both in treating patients with acute coronary syndrome, as well as in conjunction with the placement of stents, *i.e.*, medical devices commonly implanted to keep patients' arteries open, but which can trigger blood clotting.  For more than a decade, the principal medical organizations in cardiology have recommended Plavix in these and other clinical settings.  They continue to recommend it today.

32.    After Plavix's approval, the Companies continued to study the drug by funding studies conducted by independent investigators.  Among those studies were ones focused on potential "variability of response" among patients using Plavix.

33.    "Variability of response" is the difference "among individuals in their response to drugs. . . .  [W]hen a group of patients receive the same drug dosage[,] some gain a therapeutic effect, others develop toxicity, and others derive no benefit

US_Active\113990389\V-1

at all."[2]  Variability is common.  "Most major drugs are effective in only 25 to 60 percent of patients."[3]  Doctors are familiar with the phenomenon, and frequently switch patients from one drug to another until they find one that provides relief. Many things can cause variability of response, including environmental factors, genetics, and underlying medical conditions.[4]

34.    Starting in 2001, there was a robust scientific debate regarding variability of response and the role of genetics in Plavix metabolism.   The Companies supported more than 30 published studies as part of an integrated research plan on that topic.  Numerous independent investigators not affiliated with the Companies also conducted research about variability of response to Plavix and published their findings.  None of the early studies, however, concluded that people with certain genetic traits or ethnic backgrounds had worse health outcomes.

35.    As the research on variability of response continued, the Companies kept FDA fully apprised of the findings, disclosing to the Agency approximately 200 published studies relating to the subject before the 2010 labeling revision.

---

[2] Michael D. Rawlins, *Variability in Response to Drugs*, 4 Brit. Med. J. 91, 91 (1974).

[3] Grant R. Wilkinson, *Drug Metabolism and Variability Among Patients in Drug Response*, 352 New Eng. J. Med. 2211, 2211 (2005).

[4] Wilkinson, *supra* note 3, at 2211.

36.    Despite this intense study, before late 2008, not a single study had concluded that Asian or Pacific Islander patients, or patients with certain genetic traits, have worse health outcomes on Plavix than members of other racial groups.

37.    In fact, much of the evidence suggested precisely the opposite:

a.    In 1991, data in a Phase II study on Japanese patients suggested that Plavix worked *better* for the Japanese patients than other patients.[5]

b.    In 2005, BMS and Sanofi sponsored the COMMIT trial in China, with more than *45,000* Chinese patients, the single largest clinical study conducted on Plavix.[6]   That study found that adding Plavix to aspirin therapy significantly reduced the risk of heart attacks, strokes, and death in the population studied.  These results led to a new FDA-approved indication to use the drug for the most serious types of heart attacks.

c.    From the mid-1990s through mid-2000s, the Companies enrolled another 35,000 patients, without regard to race or ethnicity, in

---

[5] FDA Investigational New Drug Application (IND) No. 34,663, Serial No. 161, PLAV_SAN_0168829, at PLAV_SAN_01648849 ("[I]t appeared that the Japanese are more sensitive to the platelet aggregation effect of clopidogrel . . . .").  Phase II studies are generally part of the drug approval process with the FDA and focus on effectiveness.    *See*    FDA    Drug    Approval    Process    1, https://www.fda.gov/downloads/Drugs/ResourcesForYou/Consumers/UCM284393.pdf.

[6] COMMIT Collaborative Group, *Addition of Clopidogrel to Aspirin in 45,852 Patients with Acute Myocardial Infarction:  Randomised Placebo-Controlled Trial*, 366 Lancet 1607, 1607 (2005); *see also* Glenn N. Levine et al., *World Heart Federation Expert Consensus Statement on Antiplatelet Therapy in East Asian Patients with ACS or Undergoing PCI*, 11 Nature Rev. Cardiology 597, 603 (2014) ("In the COMMIT trial, the benefit of clopidogrel added to aspirin was demonstrated for DAPT in Chinese patients with acute myocardial infarction, predominantly STEMI, not undergoing PCI. The primary composite end point of death, reinfarction, and stroke was significantly reduced by the addition of clopidogrel to aspirin therapy, without a significant increase in bleeding.").

clinical trials showing the efficacy of Plavix.[7]  Not a single trial signaled that Plavix was ineffective for Asians or Pacific Islanders.

38.     In 2008—a decade after Plavix went on the market—Harvard professor Dr. Jessica Mega authored two studies assessing for the first time the clinical effect, if any, of a genetic variation in the CYP2C19 enzyme—the enzyme that converts Plavix to its active form.  The variation exists in people of all races but is more prevalent in persons of Asian or Pacific Islander descent.  In the first study, Dr. Mega found no significant difference in clinical outcomes based on genetic status.  In the second study, published online in December 2008, involving a different patient set, Dr. Mega reported a potential link between a genetic variation in the CYP2C19 enzyme and real-world clinical outcomes for patients using Plavix.  Dr. Mega noted, however, that the study could not "exclude meaningful effects of . . . other genetic variants" and therefore that "such variations also merit study."[8]

---

[7] *See* CAPRIE Steering Committee, *A Randomized, Blinded, Trial of Clopidogrel Versus Aspirin in Patients at Risk of Ischaemic Events (CAPRIE)*, 348 Lancet 1329, 1329 (1996) (19,185 patients); The Clopidogrel in Unstable Angina to Prevent Recurrent Events Trial Investigators, *Effects of Clopidogrel in Addition to Aspirin in Patients with Acute Coronary Syndromes Without ST-Segment Elevation*, 345 New Eng. J. Med. 494, 494 (2001) (12,562 patients); Marc S. Sabatine et al., *Addition of Clopidogrel to Aspirin in Fibrinolytic Therapy for Myocardial Infarction with ST-Segment Elevation*, 352 New Eng. J. Med. 1179, 1179 (2005) (3,491 patients).

[8] Jessica L. Mega et al., *Cytochrome P-450 Polymorphisms and Response to Clopidogrel*, 360 New Eng. J. Med. 354, 361 (2009).

**B.      FDA Requires Revisions to Plavix Label Noting Genetic Variability of Response**

39.     Even though the science was nascent and the data were contradictory, FDA in March 2009 recommended certain changes to the existing Plavix label and required the Companies to conduct post-marketing clinical trials.

40.     The Companies accepted several of the proposed labeling changes, but expressed concern with aspects of others. In particular, the Companies disagreed with changes that recommened genetic testing. The Companies explained that the variability of response and effect on clinical outcomes was only partially attributable to variations in the CYP2C19 enzyme, and that other factors, including other genetic variations, general health, comorbidities, and compliance with treatment, could also contribute. Further, the Companies considered a recommendation for genetic testing to be premature, as studies regarding the CYP2C19 variation and its importance were ongoing.

41.     In May 2009, the Plavix label was revised to add the following language to the "precautions" section:

> Based on literature data, patients with genetically reduced CYP2C19 function have lower systemic exposure to the active metabolite of clopidogrel and diminished antiplatelet responses, and generally exhibit higher cardiovascular event rates following myocardial infarction than do patients with normal CYP2C19 function.[9]

---

[9]      May 2009 Plavix label, at 14, https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020839s040lbl.pdf.

42.     The label further noted that "[p]harmacogenetic testing can identify genotypes associated with variability in CYP2C19 activity."  But the label did not recommend testing patients for genetic traits or advise doctors to alter their treatment based on race or genetic status.

43.     In November 2009, FDA approved a label that, among other changes, added the following language to the Warnings section:

> Reduced effectiveness due to impaired CYP2C19 function ("Avoid use of Plavix in patients with impaired CYP2C19 function due to known genetic variation or due to drugs that inhibit CYP2C19 activity.").[10]

44.     On November 20, 2009, FDA proposed a new label to the Companies that would move into a boxed warning information about genetic variability of response and worse clinical outcomes, and about the availability of genetic testing "as an aid in determining therapeutic strategy."

45.     The Companies' response acknowledged FDA's position that CYP2C19 polymorphism is "an avoidable risk" but disagreed with the proposed warning.  The Companies believed that the data did not show that the genetic variation had any clinical significance.  They viewed a boxed warning as unwarranted, because, among other reasons, it would over-warn clinicians.  As a result, some patients who needed the drug would not receive it.

---

[10]     November   2009   Plavix   label,   at   18, https://www.accessdata.fda.gov/drugsatfda_docs/label/2009/020839s044lbl.pdf.

US_Active\113990389\V-1

46.     Nevertheless, the Companies ultimately acceded to the Agency's position.  FDA approved a label containing the following boxed warning:

> WARNING: DIMINISHED EFFECTIVENESS IN POOR METABOLIZERS . . . . Effectiveness of Plavix depends on activation to an active metabolite by the cytochrome P450 (CYP) system, principally CYP2C19. (5.1).   Poor metabolizers treated with Plavix at recommended doses exhibit higher cardiovascular event rates following acute coronary syndrome (ACS) or percutaneous coronary intervention (PCI) than patients with normal CYP2C19 function. (12.5) Tests are available to identify a patient's CYP2C19 genotype and can be used as an aid in determining therapeutic strategy. (12.5) Consider alternative treatment or treatment strategies in patients identified as CYP2C19 poor metabolizers. (2.3, 5.1).[11]

47.     However, given the still-limited data, FDA did not adopt the approach it has taken with other drugs: it did not instruct or recommend that doctors routinely conduct genetic tests before prescribing Plavix or that they limit its use among people of particular racial or ethnic groups.

### C.    Significant Scientific Debate Continues in the Wake of the FDA Label Changes

48.     The 2009-2010 revisions to Plavix's label were highly controversial. Many leading cardiologists and organizations voiced concern that the newly evolving and mixed science on genetic variability of response did not support the new warnings.

---

[11]     March 2010 Plavix label, at 1, 3, https://www.accessdata.fda.gov/drugsatfda_docs/label/2010/020839s042lbl.pdf.

49.   For example, Dr. Harlan Krumholz—a world-renowned researcher and

cardiologist at Yale School of Medicine—stated:

> Unfortunately the FDA has taken the step of warning people about a harm that has yet to be established. This warning could lead to non-compliance, unnecessary testing and increased cost without benefiting patients. The recommendation is based on platelet activation studies and not on clinical outcomes studies. To this point we do not know if a strategy of testing patients before prescribing will provide them a net benefit.[12]

50.   Similarly, Dr. Steven E. Nissen, chairman of cardiovascular medicine

at the Cleveland Clinic, published an editorial in the *Journal of American Medicine*

calling the FDA warning "a case of 'irrational exuberance.'"  Dr. Nissen observed:

> The consequences of the FDA's leap to judgment regarding CYP2C19 testing cannot be underestimated. Several companies subsequently received FDA approval to market products for testing either CYP2C19 reduced-function alleles or platelet reactivity. The societal cost of such testing procedures remains unknown, but according to the FDA, the 'per patient' charge for genetic testing ranges from $60 to $500.12. Because clopidogrel [Plavix] is one of the most widely used drugs in medicine, the potential cost to the health care system of universal genetic testing is substantial. Preventing inappropriate CYP2C19 testing could yield substantial savings for the health care system.[13]

---

[12] Larry Husten, *Plavix Label Gets Black Box Warning About Poor Metabolizers*, Cardio Brief (Mar. 12, 2010), http://www.cardiobrief.org/2010/03/12/plavix-label-gets-black-box-warning-about-poor-metabolizers/.

[13] Steven E. Nissen, Editorial, *Pharmacogenomics and Clopidogrel: Irrational Exuberance?*, 306 J. Am. Med. Ass'n 2727, 2728 (2011).

US_Active\113990389\V-1

51.    The American College of Cardiology and American Heart Association—the nation's principal cardiology organizations—likewise concluded that the FDA-imposed warning prematurely informed about an unproven risk.  The two organizations published a joint Clinical Alert, explaining that the "specific impact of the individual genetic polymorphisms on clinical outcome remains to be determined" and stressing that "[t]he evidence base is insufficient to recommend either routine genetic or platelet function testing."[14]

52.    Additional studies cast further doubt on FDA's decision to add a black box warning on genetic variability of response to Plavix.  Following the December 2008 Mega study, the Companies re-examined the data in their earlier trials by genotyping the thousands of patients in those studies based on blood samples retained from the trials.  The results showed no association between genetic status and clinical effect.[15]  Other independently researched studies published after the May

---

[14] David R. Holmes Jr. et al., *ACCF/AHA Clopidogrel Clinical Alert:  Approaches to the FDA "Boxed Warning":  A Report of the American College of Cardiology Foundation Task Force on Clinical Expert Consensus Documents and the American Heart Association*, 56 J. Am. C. Cardiology 321, 334 (2010).

[15] Deepak L. Bhatt, *The Relationship Between CYP2C19 Polymorphisms and Ischemic and Bleeding Outcomes in Stable Patients: The CHARISMA Genetics Study*, 33 Eur. Heart J. 2143, 2143 (2012) ("No relationship was seen between CYP2C19 status and ischemic outcomes in stable patents treated with clopidogrel."); Guillaume Paré et al., *Effects of CYP2C19 Genotype on Outcomes of Clopidogrel Treatment*, 363 New Eng. J. Med. 1704, 1714 (2010) (based on genotyping of 5,059 patients, "CYP2C19 loss-of-function variants do not modify the efficacy and safety of clopidogrel").

2009 labeling change made similar findings.[16]  In fact, numerous clinical studies have now shown that Asian patients on Plavix have better clinical outcomes (i.e., reduced heart attacks or strokes) compared to other races.[17]

53. Based on the findings in the more recent literature, even Dr. Mega herself has concluded, as part of a 2014 World Health Organization-affiliated panel, that the combination of Plavix plus aspirin remains a "reasonable first choice" for people of East Asian descent.[18]

54. And in 2015, cardiologists from Queen's Medical Center in Hawai`i published an article in the peer-reviewed *Hawai`i Journal of Medicine and Public*

---

[16] *See, e.g.*, Jacob A. Doll et al., *Impact of CYP2C19 Metabolizer Status on Patients with ACS Treated with Prasugrel Versus Clopidogrel*, 67 J. Am. C. Cardiology 936, 936 (2016) (finding that "CYP2C19 metabolizer status is not associated with the composite outcome of cardiovascular death, MI, or stroke" in ACS patients treated with Plavix, and noting that "[o]ur findings do not support routine CYP2C19 genetic testing in this population"); Robert S. Kumar et al., *Effect of Race and Ethnicity on Outcomes with Drug-Eluting and Bare Metal Stents:  Results in 423,965 Patients in the Linked National Cardiovascular Data Registry and Centers for Medicare & Medicaid Services Payer Databases*, 127 Circulation 1395 (2013).

[17] Yong Huo, *2018 Update of Expert Consensus Statement on Antiplatelet Therapy in East Asian Patients with ACS or Undergoing PCI*, 64 Sci. Bull. 166, 167 (2019); Kumar et al., *supra* note 16; Kang et al., *Racial Differences in Ischemia/Bleeding Risk Trade-Off during Anti-Platelet Therapy: Individual Patient Level Landmark Meta-Analysis from Seven RCTs*, Thromb Haemost 2019; 119:149-62; *see also* Koon-Hou Mak et al., *Ethnic Variation in Adverse Cardiovascular Outcomes and Bleeding Complications in the Clopidogrel for High Atherothrombotic Risk and Ischemic Stabilization, Management, and Avoidance (CHARISMA) Study*, 157 Am. Heart J. 658, 658 (2009) ("[E]thnicity was not a significant, independent predictor of . . . cardiovascular event[s].").

[18] Levine et al., *supra* note 6, at 603.

22

*Health* specifically addressing the State's claim in the UDAP suit.  Notwithstanding the State's "assert[ion] that patients of Asian and Pacific Island ethnicity may be . . . less responsive to the actions of clopidogrel [Plavix],"[19] the article observed, their research did not find "any additional supporting evidence for tailored therapy based upon genetic testing."  The authors expressly did "not recommend the routine testing for CYP polymorphisms as a basis for changing antiplatelet therapies."[20]

## D.  FDA Removes the Language Referring to Genetic Traits and Clinical Outcomes from the Plavix Label

55.    In 2016 FDA took the rare step of removing the language referring to the link between genetic traits and clinical outcomes from the Plavix label.

56.    Scientific discussion and debate about genetic variability in responsiveness to Plavix continues today, although the near unanimous view is that Plavix is effective in patients of all races and ethnicities and that routine genetic testing is not recommended.

a.    The leading medical guidelines and consensus statements— including those authored by the Chinese Cardiology Society and

---

[19] Adnan M. Bhopalwala et al., *Routine Screening for CYP2C19 Polymorphisms for Patients Being Treated with Clopidogrel Is Not Recommended*, 74 Haw. J. Med. & Pub. Health 16, 16, 19 (2015).

[20] *Id.* at 19.

US_Active\113990389\V-1

the Japanese Society of Cardiology[21]—currently recommend Plavix to patients regardless of their race or genetic profile.[22]

b.    Similarly, in its 2018 update, the World Heart Federation reaffirmed its prior recommendation that "[d]espite a lower platelet inhibitory response to clopidogrel, East Asian patients show a *similar or even a lower rate* of ischemic event occurrence" compared with Caucasian patients.[23]

c.    From 2009 to the present, 46 medical consensus statements and guidelines have been issued in the United States, Europe, and Asia (China, Japan, Korea, and Taiwan) addressing the use of Plavix in various clinical settings.  None of these 46 consensus statements and guidelines recommends the routine use of genetic testing to identify patients with low or no response to Plavix.

d.    The most recent consensus statement issued by the American College of Cardiology and American Heart Association in 2019 acknowledges that some studies reported an association between the CYP2C19 genetic defect and clinical outcomes in patients undergoing stent placements (as opposed to patients taking Plavix after a heart attack or stroke without stenting), and stated that testing may be an option in certain high-risk clinical

---

[21] *See, e.g.*, Yukio Ozaki et al., *CVIT Expert Consensus Document on Primary Percutaneous Coronary Intervention (PCI) for Acute Myocardial Infarction (AMI) in 2018*, 33 Cardiovascular Intervention & Therapeutics 178, 182-83 (2018).

[22] *E.g.*, Holmes, Jr. et al., *supra* note 14; Glenn N. Levine, et al., *2016 ACC/AHA Guideline Focused Update on Duration of Dual Antiplatelet Therapy in Patients with Coronary Artery Disease*, 68 J. Am. C. Cardiology 1082 (2016); Ezra A. Amsterdam et al., *2014 AHA/ACC Guideline for the Management of Patients with Non-ST-Elevation Acute Coronary Syndromes*, 64 J. Am. C. Cardiology e139 (2014); Glenn N. Levine et al., *2011 ACCF/AHA/SCAI Guideline for Percutaneous Coronary Intervention:  A Report of the American College of Cardiology Foundation/American Heart Association Task Force on Practice Guidelines and the Society for Cardiovascular Angiography and Interventions*, 58 J. Am. C. Cardiology e44 (2011).

[23] Huo, *supra* note 17, at 166.

24

situations (*e.g.*, complex, multi-vessel coronary disease).[24]  But the authors again reaffirmed that routine genetic testing for Plavix patients is not recommended.[25]  The authors also observed that despite a higher prevalence of CYP2C19 genetic defects, East Asians did not show an elevated risk for ischemic events.[26]

57.     In other words, the most recent expert statement on genetic variability of response to Plavix confirms that the drug works as well, if not better, in Asian and Pacific Islander patients.

58.     Plavix continues to be prescribed in East Asian countries.

**E.     The State Perceives No Public Health Risk Surrounding Plavix in Light of FDA's Revision to the Plavix Label**

59.     Although the State had means to address any concerns it had about the genetic variability of response to Plavix, it neither did nor said anything suggesting the slightest unease regarding the supposed genetic variability of response to Plavix in light of FDA's revisions to the Plavix label.

   a.     The State's Medicaid program contractors include Plavix on their formularies and continue to cover the drug today without restrictions based on racial, ethnic, or genetic status.

   b.     The State has never sent any notification or warning to doctors about genetic variability of response issues related to Plavix,

---

[24] Dirk Sibbing et al., *Updated Expert Consensus Statement on Platelet Function and Genetic Testing for Guiding P2Y12 Receptor Inhibitor Treatment in Percutaneous Coronary Intervention*, 12 J. Am. C. Cardiology Cardiovascular Interventions 1521, 1532-34 (2019).

[25] *Id.* at 1534.

[26] *Id.* at 1527.

US_Active\113990389\V-1

        although it has sent "memoranda" on other occasions to provider health plans and prescribers with information about other drugs.

c.     The State has never initiated any educational campaigns to urge doctors to alter prescribing practices, even though the State has initiated such campaigns on other occasions for other drugs.

d.     Former Hawai`i Medicaid officials who worked at the agency during the 2009-2010 labeling revisions testified during recent depositions that they do not remember having any concerns about Plavix or informing physicians about any genetic issues relating to the drug.

e.     State-affiliated hospitals have never imposed any requirement or conditions with respect to race or ethnicity on the prescription of Plavix.

60.    In discovery, the Companies asked the State to identify any alerts, warnings, or advisories regarding Plavix that it sent providers and insurers. The State's only response was to refer to press conferences and news media related to the filing of the UDAP lawsuit.

61.    Similarly, when asked to "describe all steps or actions taken by the State to protect or improve the health of residents of Hawai`i from alleged Plavix-related harms," the State could point to nothing besides its "widespread publicity regarding the filing of the lawsuit . . . [which] helped inform physicians, patients, and the general public about the genetic issue and the availability of genetic testing."

62.    The State also confirmed, in response to the Companies' request that it identify promotional materials on which State personnel relied in making decisions

26

concerning coverage or reimbursement or Plavix, that the State "has not identified any responsive documents concerning decisions by State personnel."

63.    The Companies also asked the State to "identify and describe every instance in which any Hawai`i Medicaid, MCO, Public Entity, or Third Party Contractor employee, agent, or consultant recommended, suggested, or otherwise expressed the view that [the State] should not continue to reimburse for the use of Plavix, should impose restrictions on its reimbursement, or should not include it on a PDL or formulary."  The State confirmed that it is "not aware of any instance in which State personnel expressed such views."

64.    The State's expert reports confirm the lack of any public health concern in Hawai`i regarding genetic variability of response to Plavix.  The State's experts do not include any cardiologist from Hawai`i, nor from any Asian country.  The reports are devoid of evidence that any doctor in Hawai`i ever expressed concern about genetic variability of response or changed their prescribing behavior in any way, or that anyone in Hawai`i actually suffered harm from Plavix.

### F.    Contingency-Fee Lawyers Persuade the State to Hire Them to Pursue Claims Under Hawai`i's Unfair or Deceptive Acts or Practices Statute

65.    Five years after FDA's label revision, in or around 2014, private plaintiffs' lawyers approached the Attorney General of Hawai`i, proposing that the State retain them on a contingency fee basis to file an enforcement action against the Companies for alleged deceptive marketing.

66.    The State had exhibited no independent interest in pursuing an enforcement action against the Companies for deceptive marketing.  It conceded in discovery that the UDAP action was "a result of an investigation or inquiry by the Attorney General" only, and not by Hawai`i Medicaid or any other public entity.  The Attorney General's Office reported no complaints.

67.    The private firms' offer to bring and litigate an enforcement action for civil penalties on a contingency-fee basis presented no budgetary risk to the State, and offered a chance for a large payout if the private lawyers prevailed.

68.    The State contracted with a Hawai`i law firm, Cronin Fried Sekiya Kekina & Fairbanks ("Cronin Fried").  Cronin Fried, in turn, partnered with Salim-Beasley LLC ("Salim-Beasley"), a plaintiffs' firm that—since its founding in 2012—has pursued numerous mass tort and consumer fraud suits against pharmaceutical companies.

69.    Under the State's contract with Cronin Fried, that firm agrees to:

    a.    "[P]repare and fil[e] of all claims, pleadings, responses, motions, petitions, memoranda, briefs, notices and other documents,"

    b.    "[C]onduct negotiations and provide representations at all hearings, depositions, trials, appeals, and other appearances,"

    c.    "[C]ontrol and direct performance and details of the work and services required under this Agreement,"

    d.    "[A]dvance all costs and expenses and provide all necessary personnel in order to comply with any discovery request . . .

28

[including] [w]orking directly with State personnel who may be tasked with responding to discovery requests," and otherwise

e.    "[P]rovide all legal services that are reasonably necessary."

70.    The contract further provides that Cronin Fried "shall receive a contingency fee of 20% from the net proceeds of any judgment or settlement," but shall recover "no compensation for any services rendered" if the State does not settle or is not awarded civil penalties.

71.    Nothing in the contract suggests that Cronin Fried should consider or report to the Attorney General on the medical consequences, First Amendment implications, or even the *bona fides* of the claim.

72.    On March 19, 2014, Salim-Beasley and Cronin Fried initiated a civil enforcement action on behalf of the State in the First Circuit Court of Hawai`i in 2014, seeking, among other things, civil penalties under the UDAP statute.  No attorney employed by the State signed the pleading or appeared in the attorney signature block.

73.    In a press conference on the lawsuit, the Attorney General claimed the Companies should have disclosed that "Plavix was not effective or had a diminished effect on people of East Asian descent or Pacific Islander descent, of which approximately 50% of the population in Hawai`i is of that extraction or descent."  KITV, *Hawaii Files Suit Against Manufacturers of Plavix Heart*

29

*Medication*, YouTube (Mar. 19, 2014), https://www.youtube.com/watch?v=-90U08FU9aA (at 0:46-1:07).

74.  In an interview on Hawai`i Public Radio that same day, the Attorney General again emphasized that Plavix "was particularly ineffective in Hawai`i" because the State "has a very large population of Pacific Islanders and East Asian people." Molly Simon, *Hawaii Attorney General Sues Makers of Plavix*, Hawaii Public Radio (March 19, 2014), http://hpr2.org/post/hawaii-attorney-general-sues-makers-plavix (at 0:40-1:03).

75.  The thrust of the claims in the UDAP suit, as the State's expert reports confirm, is that "[s]ince at least 1998, [the Companies] have known that over 30% of patients had little or no response to Plavix," and that "[r]ather than publish this information, [the Companies] concealed it from treating physicians." Gurbel Expert Report ¶ 28; *see also* Second Am. Compl. ¶ 29, *State ex. rel. Connors v. Bristol-Myers Squibb Co.*, No. 14-1-0708-03 DEO (Haw. Cir. Ct. Dec. 4, 2018).  In other words, the State claims that the Companies should have stated that Plavix worked less well in certain populations more than a decade before Dr. Mega's study first raised the possibility and long before FDA itself believed any such warning was warranted.

76.  The State claims that the Companies engaged in "unfair or deceptive acts or practices in the conduct of any trade or commerce," Haw. Rev. Stat. § 480-

2(a), by—among other things—"actively suppress[ing]" research about genetic variability of response to Plavix, Gurbel Expert Report ¶ 79, and "failing to timely and proactively comply with their obligation to update the Plavix label to provide prescribing physicians with 'adequate instructions for use,' and to alert the FDA and physicians to the fact that a significant portion of the population was genetically predisposed to diminished or non-responsiveness to Plavix," *id.* at ¶ 123-27. *See also* Second Am. Compl. ¶¶ 94, 97, *State ex. rel. Connors v. Bristol-Myers Squibb Co.*, No. 14-1-0708-03 DEO (Haw. Cir. Ct. Dec. 4, 2018).

77.    The State does not allege that a single person in Hawai`i was actually harmed by the Companies' purported deceptive statements or omissions regarding Plavix—indeed, on the State's theory, it does not need to allege any such harm.

78.    The State seeks to punish the Companies through civil penalties of up to $10,000, per Company under the UDAP statute beginning in 1998 for each repeated violation of the UDAP, *see* Haw. Rev. Stat. § 480-3.1, and additional civil penalties of up to $10,000, per violation, per Company, for each repeated and willful violation of the UDAP statute directed toward or that targeted elders, *see id.* § 480-13.5. The State has provided expert witness testimony from Dr. Nicole Maestas purporting to quantify and support its claim for penalties. In her report, served on December 29, 2019, Dr. Maestas asserted that the total number of Plavix prescriptions and non-retail units sold in Hawai`i during the relevant period is

834,012.   Expert Report of Nicole Maestas, PhD (Dec. 29, 2019), *State ex rel. Connors v. Bristol-Myers Squibb Co.* No. 14-1-0708-03 DEO (Haw. Cir. Ct.), ¶ 42. Dr. Maestas calculated penalties "ranging from a minimum of $417,006,000 to a maximum of $8,340,120,000." *Id.* ¶ 43.

79.   The State also seeks disgorgement and punitive damages.

80.   Salim-Beasley subsequently withdrew from the litigation, and a Texas law firm, Baron & Budd, P.C. took over the case.

81.   Contrary to Hawai`i's procurement statute, the State has no formal contract with Baron & Budd.  Instead, Cronin Fried has apparently retained Baron & Budd as "outside assistance."  The State's contract with Cronin Fried provides that "the Attorney General shall have final authority over all aspects of this Litigation" and "must approve in advance all aspects of this Litigation."  The State has no such agreement with Baron & Budd.  Any control or supervision of Baron & Budd by the Attorney General is, at best, indirect.

82.   Moreover, Hawai`i relies on an expert who is also a relator in a qui tam suit regarding Plavix in New Jersey federal court involving allegations and claims similar to those in the Hawai`i UDAP suit.  Gurbel Expert Report; *see United States ex rel. JKJ Partnership 2011, LLP v. Sanofi Aventis, U.S. LLC*, 315 F. Supp. 3d 817 (D.N.J. 2018).  That case is now on appeal.  Dr. Gurbel does not disclose in the

UDAP litigation that he stands to gain tens of millions of dollars if courts accept his theory.

## VIOLATIONS OF LAW

83.     The Free Speech Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The Fourteenth Amendment of the United States Constitution made this proscription applicable to the States and their political subdivisions.  *E.g.*, *NIFLA*, 138 S. Ct. at 2371.

84.     In addition to providing protections against restrictions on speech, the First Amendment protects against the government's compelling individuals or entities to engage in speech.   Compelled speech ordinarily is subject to strict scrutiny.  *See, e.g.*, *id.* at 2371; *Wooley v. Maynard*, 430 U.S. 705, 715-17 (1977). As the Supreme Court held just last Term, "[f]orcing free and independent individuals to endorse ideas they find objectionable is always demeaning, and for this reason, one of our landmark free speech cases said that a law commanding 'involuntary affirmation' of objected-to beliefs would require 'even more immediate and urgent grounds' than a law demanding silence." *Janus v. Am. Fed'n of State, Cty., & Mun. Employees, Council 31*, 138 S. Ct. 2448, 2464 (2018) (quoting *W. Va. Bd. of Ed. v. Barnette*, 319 U.S. 624, 633 (1943)).

85.     Over the past several decades, the Supreme Court has expanded the First Amendment protections accorded to commercial speech. *See, e.g.*, *Expressions*

*Hair Design v. Schneiderman*, 137 S. Ct. 1144, 1150-51 (2017) (holding that a law regarding merchants' communications of credit card surcharges to customers implicated constitutionally protected speech). Regulations of speech, including commercial speech, that are based on speaker, content, or viewpoint, are presumptively invalid, and are subject to "heightened judicial scrutiny." *Sorrell*, 564 U.S. at 565. Heightened scrutiny ranges from strict scrutiny—which requires that the regulation be narrowly tailored to serve a compelling state interest, *Reed v. Town of Gilbert, Ariz.*, 135 S. Ct. 2218, 2226 (2015)—to, at minimum, the less demanding, but still rigorous, standard of *Central Hudson Gas & Electric Corp. v. Public Service Commission*, 447 U.S. 557, 566 (1980)—which requires that the regulation be no more extensive than necessary to directly advance a substantial government interest.

86.    The Supreme Court's reinforcement of the protections for commercial speech reached new heights in 2018. In *NIFLA v. Becerra*, 138 S. Ct. 2361, itself a noncommercial case, the Court made clear that a regulation that compels, rather than restricts, commercial speech can survive First Amendment scrutiny only if it is "purely factual and uncontroversial," and even then, only if the regulation is not "unjustified or unduly burdensome." *See also, e.g.*, *Zauderer v. Office of Disciplinary Counsel,* 471 U.S. 626 (1985); *Am. Beverage Assoc. v. City & County of S.F.*, 916 F.3d 749, 756-58 (9th Cir. 2019) (en banc) (granting preliminary injunction against required warning for sweetened beverages); *Nat'l Ass'n of Wheat*

US_Active\113990389\V-1

*Growers v. Zeise*, 309 F. Supp. 3d 842, 850-54 (E.D. Cal. 2018) (granting preliminary injunction against state-required carcinogenicity warning for herbicide). The State bears the burden of establishing that its regulation of speech meets these standards. *Sorrell*, 564 U.S. at 571-72; *Edenfield v. Fane*, 507 U.S. 761, 770-71 (1993).

### A.   The State's UDAP Penalty Claims Violate the Companies' First Amendment Rights

87.   The State's lawsuit to enforce a legal duty to provide an adequate warning constitutes state action that is subject to the First Amendment.  Here, the State's UDAP enforcement action against the Companies for alleged failure to warn about genetic variability of response to Plavix violates the First Amendment for two reasons.

88.   *First*, the State's UDAP suit attempts to compel the Companies to express specific views about Plavix on the package insert—views that the Companies (as well as almost all medical experts) believe are wrong, and that never had strong support, but rather were highly controversial and contested in the scientific literature.  The burdens the lawsuit places on the Companies' speech fail any level of scrutiny.

89.   *Second*, the State seeks to impose exorbitant penalties on the Companies' speech without a showing of harm or malice.  Hawai`i's UDAP statute relieves the State of the need to show harm or malice in order to pursue a penalty

35

action against the Companies. The Supreme Court has held that such a mismatch between the burdens imposed and the putative state interests violates the First Amendment.

### 1. The State's UDAP penalty claims cannot survive heightened scrutiny

90. The State's UDAP claims attempt to force the Companies to make specific, controversial statements about Plavix on the package insert.

91. The compelled speech in this case is noncommercial and thus subject to strict scrutiny. The package insert does not "propose a commercial transaction." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 760 (1976). The patient or consumer does not see the insert before receiving the product, if ever. *See, e.g.*, *Craft v. Peebles*, 893 P.2d 138, 155 (Haw. 1995) (learned intermediary doctrine "substitutes the [prescribing] physician for the consumer as the person to receive … warnings" (citations omitted)). Moreover, FDA regulations require that the labeling "be informative and accurate and neither promotional in tone nor false or misleading in any particular." 21 C.F.R. § 201.56(a)(2). These regulations preclude use of the package insert as a "commercial advertisement for the sale of goods and services," *U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.*, 898 F.2d 914, 933 (3d Cir. 1990) (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983); *Central Hudson*, 447 U.S. at 561).

92.    But even if information on a package insert were treated as commercial speech, the State's actions would still impermissibly intrude on the Companies' First Amendment rights.

93.    The State's regulation of speech here discriminates on the basis of speaker, content, and viewpoint.    It is speaker-based because it targets pharmaceutical companies.    No one other than the Companies is required to make the challenged statements.    The State's regulation of speech is content-based because it seeks to control the content of the Companies' speech about Plavix.    And the State's regulation of speech is viewpoint-based because it seeks to require the Companies to adopt a viewpoint at odds with their position about Plavix.    The regulation therefore must withstand heightened scrutiny.

94.    The State cannot show that compelling speech through a UDAP lawsuit, piloted by private contingency-fee plaintiffs' lawyers, is narrowly tailored to serve a compelling interest.    Indeed, the State's regulation of speech through this UDAP enforcement action cannot even meet the *Central Hudson* test.    The UDAP suit extends farther than necessary to directly advance a *substantial* government purpose—it does not advance even a *legitimate* government purpose.    Nor can the State invoke the standard applicable to purely factual, noncontroversial and appropriate compelled commercial speech.    The warnings the State seeks to mandate are not purely factual.    They are controversial.    And mandating that they be included

37

on the Plavix label is both unjustified and an undue burden on the Companies' First Amendment rights.

          *a.     The State's preferred warnings are neither factual nor uncontroversial*

95.     The State seeks to penalize the Companies for "failing to disclose, in Plavix's labeling and otherwise, that Plavix has diminished or no effect on a significant percentage of the patient population," as well as by marketing Plavix as "more effective and safer than other competitor drugs in Plavix's labeling and otherwise."  In other words, the State's theory of liability is that the Companies should have voiced the State's preferred opinions about the genetic variability of response to Plavix from 1998 to the present.

96.     The warning the State would mandate is not purely factual.  It reflects opinions—indeed, wrong opinions.  The overwhelming consensus of scientific experts, cardiology organizations and regulatory authorities is that no evidence supports a need for routine genetic testing, or a warning that East Asian or Pacific Islander patients have worse clinical outcomes while on Plavix.

97.     Throughout the period covered by the State's UDAP action, the views the Companies expressed about Plavix in its labeling were truthful and consistent with the scientific evidence.  The genetic variability of response to Plavix was the subject of active scientific debate perhaps a decade ago, but the Companies' view

38

that Plavix is safe and effective without regard to race or ethnicity has long reflected and continues to reflect the overwhelming medical consensus.

        *b.*      *The State has no genuine interest in requiring the Companies to warn about genetic variability of response*

98.    The State may only regulate commercial speech that is not "purely factual and uncontroversial" if doing so would, at minimum, "directly advance a substantial government interest" and the measures are "no more extensive than necessary to serve that interest"—assuming that the even more rigorous standard of strict scrutiny does not apply.

99.    Here, the State has no legitimate government interest in requiring the Companies to include information warning about the alleged genetic variability of response to Plavix.

100.    Before private law firms approached the Attorney General proposing that the State hire them on a contingency fee basis to litigate a UDAP enforcement action seeking hundreds of millions of dollars in civil penalties, the State had exhibited no concern about the issue of variability of response to Plavix.

101.    It appears that the State itself had never conducted any investigations or inquiries regarding Plavix, and never took steps to alert doctors about any concerns regarding genetic variability of response to Plavix.  Even today, the State's Medicaid insurers continue to recommend and cover Plavix for patients of all races

39

without genetic testing.  In recent testimony in the UDAP enforcement action, State Medicaid officials reported that they recalled no concerns about the drug.

102.   Even assuming the State did have a legitimate interest in public health and safety or consumer protection, the lawsuit, and the warnings the State seeks to impose, are more extensive and burdensome than necessary to serve that interest.

103.   The State would apparently have the Companies say that Plavix has a diminished effect on approximately 30% of the patient population and that a simple genetic test would identify the patients for whom Plavix would not work.  There is no scientific basis for such a statement—not now, and certainly not in 1998, when the State claims the Companies should have informed about this alleged risk.  In fact, FDA in 2016 removed from the Plavix label the only language suggesting that those with a genetic variation had worse clinical outcomes than other patients— confirming that such warnings are unnecessary.  Moreover, the way the State would coerce the Companies to make these statements is through a massive award of civil penalties that will chill speech not only about Plavix, but also about other drugs, and not only by BMS and Sanofi, but also by other pharmaceutical companies.

104.   The State cannot avoid these constitutional limits on the compulsion of speech by claiming that the Companies' speech, absent the language the State seeks to mandate, is misleading.  *Cf. Central Hudson*, 447 U.S. at 566.  A claim of falsity does not automatically strip away First Amendment protections.  "[E]rroneous

40

statement is inevitable in free debate, and it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *N.Y. Times v. Sullivan*, 376 U.S. 254, 271-72 (1964) (alteration in original) (quoting *NAACP v. Button*, 371 U.S. 415, 433 (1963)).

105.   Indeed, the very process of determining whether a statement is false or misleading can have chilling effects.  As the Supreme Court pointed out in *Gertz*, 418 U.S. at 340, "punishment of error runs the risk of inducing a cautious and restrictive exercise of the constitutionally guaranteed freedoms of speech and press." *See also, e.g.*, *id.* at 341 (noting the "fear that the prospect of liability for injurious falsehood might dissuade a timorous press from the effective exercise of First Amendment freedoms").   Therefore, the Court has held, "First Amendment standards . . . must give the benefit of any doubt to protecting rather than stifling speech." *Citizens United v. FEC,* 130 S. Ct. 876, 891 (2010).

106.   The Court has clarified that only "inherently misleading" speech—*i.e.*, speech that "may [not] be presented in a way that is not deceptive"—falls outside the usual First Amendment protection.  *In re R.M.J.*, 455 U.S. 191, 203 (1982); *see also Pearson v. Shalala*, 164 F.3d 650, 655 (D.C. Cir. 1999).  The Companies' position about Plavix is not "inherently misleading;" it reflects the expert medical consensus.

41

107.  In any event, a contention that the Companies' statements were misleading would simply assume the validity of the State's UDAP claims.  And the overwhelming scientific consensus—including dozens of peer-reviewed articles that support the Companies' position—makes plain that such an assumption would be plainly unwarranted.

### 2.   The State's UDAP enforcement action impermissibly seeks penalties without a showing of harm

108.  The State's enforcement action also violates the First Amendment because the Hawai`i UDAP statute permits the State to recover penalties without showing injury to any person or institution, or malice by the Companies.  Unlike the consumer protection statutes of many states, Hawai`i's UDAP statute imposes a minimum $500 penalty per violation, leaving the court no discretion to forgo penalties even absent any injury.  *Compare, e.g.*, Haw. Rev. Stat. § 480-3.1, *with, e.g.*, W. Va. Code § 33-11-6, *and* Cal. Bus. & Prof. Code § 17206(b).  In other words, the UDAP civil penalty provisions relieve the State of the need to justify burdening speech through an enforcement action.  The First Amendment does not permit such a mismatch between the burden on speech and any putative state interest in penalizing false or misleading statements.

109.  Indeed, the Supreme Court in *Gertz*, 418 U.S. at 349, addressed a similar "oddity of tort law" that permitted damages for defamation "without evidence of actual loss."  The Court held that the "strong and legitimate state

42

interest" in compensating injured private parties "extends no further than compensation for actual injury." *Id.* at 348-49. Discretion "to award damages where there is no loss," the Court found, "unnecessarily compounds the potential of any system of liability for defamatory falsehood to inhibit the vigorous exercise of First Amendment freedoms." *Id.* at 349. Only where the defendant acted with actual malice could there be liability without injury. *Id.*

110. As the Court explained in *New York Times v. Sullivan*, 376 U.S. at 277-78, absent such a limitation and "the need for any proof of actual pecuniary loss," the prospect of massive, disproportionate verdicts creates "an atmosphere in which the First Amendment freedoms cannot survive." The Court reaffirmed *Gertz* in *Dun & Bradstreet, Inc. v Greenmoss Builders, Inc.*, 472 U.S. 749, 763 (1985) (plurality opinion), barring presumed or punitive damages absent actual malice in defamation cases on matters of public concern.

111. Insofar as Hawai`i asserts some generalized interest in deterring false statements, it is no more substantial than the state's interest in *Gertz*, 418 U.S. at 341, in upholding "the individual's right to the protection of his own good name," which the Court revered as fundamental, "reflect[ing] no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty."

112.    Nor is there reason to believe that imposing penalties without injury or actual malice is necessary to further any such interest.  It is no serious burden on the State to establish those elements as a predicate for a UDAP enforcement action.  The UDAP enforcement provision and the State's deployment of it here therefore cannot stand.

## B.    The State's Pursuit of a UDAP Enforcement Action Chills Legitimate Scientific Debate

113.    The First Amendment harms to the Companies are ongoing.  Every day that the UDAP suit is pending, the threat of punishment for failing to make the State's preferred statements about Plavix intolerably threatens not only the scientific discussion that continues with respect to genetic variability of response to Plavix, but also debate about other drugs.  That scientific debate is necessary to medical progress.

114.    The Supreme Court has stated that, "in the area of freedom of speech[,] . . . courts must always remain sensitive to any infringement on genuinely serious . . . scientific expression." *Miller v. California*, 413 U.S. 15, 22-23 (1973); *see also, e.g.*, *Bd. of Trs. of Leland Stanford Junior Univ. v. Sullivan*, 773 F. Supp. 472, 474 (D.D.C. 1991) ("[T]he First Amendment protects scientific expression and debate just as it protects political and artistic expression.").  The First Amendment serves a critical function "in the fields of medicine and public health, where information can save lives." *Sorrell*, 564 U.S. at 566.

44

115.  By seeking enforcement against the Companies under the UDAP statute for the Companies' alleged failure to warn about the supposed genetic variability of response to Plavix, the State communicates that at its whim, pharmaceutical manufacturers must take public positions and provide warnings that they believe are scientifically unjustified, or else face the prospect of hundreds of millions, if not billions, in penalties.

116.  The chill is intensified given that the Companies' liability will depend on whether a lay jury or judge without expertise in the complex scientific issues at stake can be persuaded that the information the Companies did provide was not misleading—a situation that "is delicate and sensitive and has serious implications for the right to freedom of expression." *Nat'l Rev., Inc. v. Mann*, 140 S. Ct. 344, 346 (Alito, J., dissenting from the denial of certiorari).  Whether "assertions about . . . scientific data can be shown to be factually false" is "highly technical" and "not an easy matter for lay jurors to assess." *Id.*  And when allegedly false or misleading speech "concerns a political or social issues that arouses intense feelings, selecting an impartial jury presents special difficulties." *Id.*  These factors make it all the more likely that the Companies will refrain from making statements about their products with which the State may disagree, for fear that an inexpert court or jury will later be the arbiter of the truth of those statements.

US_Active\113990389\V-1

117.   The chilling effects of this lawsuit range beyond the parties, to all pharmaceutical companies marketing products that are the subject of scientific—or even unscientific—controversy.   Rather than risk incurring crippling liability, companies may refrain from participating in the scientific debate, or from engaging in truthful speech about their products where that speech does not accord with the State's views.   The threat of massive liability similarly pressures companies to provide warnings beyond what is necessary or even prudent, in order to avoid assaults by private plaintiffs' lawyers who have appropriated the powers, as well as the credibility, of the State.

### C.   The State's Delegation of Its Enforcement Authority to Private Contingency Fee Counsel Heightens the Intrusion on the Companies' First Amendment Rights

118.   The State's imposition on the Companies' First Amendment rights is even more problematic, and has even greater chilling effect, because the State has delegated its enforcement power to private outside counsel who are subject neither to the ordinary safeguards against private regulation of speech, nor to institutional constraints on government regulation of speech.

119.   As far as can be discerned from the public, non-privileged aspects of the case, the State has left the direction of the litigation to its private contingency-fee counsel.   No State attorney has entered any appearance as counsel of record, signed any significant pleadings or motions, argued at a hearing, or taken or defended a deposition.

46

120.   Legal regimes that delegate to private parties the authority to bring enforcement actions against allegedly false or misleading speech lack the traditional "legal and practical checks that tend to keep the energies of public enforcement agencies focused upon more purely economic harm," and that protect against undue intrusion on First Amendment rights.  *Nike, Inc. v. Kasky*, 539 U.S. 654, 679-80 (2003) (Breyer, J., dissenting from dismissal of writ of certiorari as improvidently granted); Brief for the United States as Amicus Curiae Supporting Petitioners at 9-26, *Nike, Inc. v. Kasky*, 539 U.S. 654 (No. 02-575), 2003 WL 899100; *cf. Reno v. ACLU*, 521 U.S. 844, 880 (1997) (striking down a provision of the Communications Decency Act of 1996 because "[i]t would confer broad powers of censorship, in the form of a 'heckler's veto,' upon any opponent of indecent speech who might simply log on and inform the would-be discoursers that [a minor] child . . . would be present").

121.   This is a case in point.  By authorizing private contingency-fee counsel to pursue the UDAP claims, putatively on the State's behalf, the State enables those attorneys to circumvent the ordinary limits on private suits that regulate speech.

122.   For example, private plaintiffs generally may not bring actions to punish or restrict speech absent some showing of actual injury or reliance.  *See Gertz*, 418 U.S. at 348-49.  But the UDAP statute allows the State to bring a civil enforcement action without alleging those elements, Haw. Rev. Stat. § 480-3.1, and

the State's retention of private counsel permits those private attorneys to litigate UDAP claims unencumbered by the doctrinal limits that would ordinarily apply to them.

123.   And while other legal and practical safeguards provide checks on the State's enforcement authority and generally prevent undue intrusion on First Amendment rights, those institutional checks do not constrain private counsel.  For instance, State officials are elected or otherwise appointed to serve the public interest, and thus have an obligation to bring only actions that are a sound use of public resources and that promote the public interest.  *See* Restatement (Third) of the Law Governing Lawyers § 97 & cmt. b; *State v. Lead Indus. Ass'n, Inc.*, 951 A.2d 428, 471-76 (R.I. 2008) (describing the distinct role of the Attorney General). But counsel for private parties are not elected or appointed to serve the public interest, are not subject to public oversight and supervision, are not stewards of limited public resources, and do not have to exercise prosecutorial discretion in their day-to-day practice.  Private lawyers spend their careers seeking to win cases on behalf of clients whether or not the public interest or the interests of justice require it, *see* Model Rule of Professional Conduct 1.2, 1.3 & cmt. 1, and whether or not winning infringes on the defendants' constitutional rights.  These lawyers routinely allow the adversarial system to resolve issues that a government lawyer would not let get that far.

US_Active\113990389\V-1

124.   The incongruity between the obligations of government lawyers and private lawyers creates the possibility of abuse when private lawyers are retained to litigate on behalf of governmental clients and must suddenly assume a fundamentally different role.

125.   When constitutional rights are at stake, it cannot be left to private lawyers to voluntarily abide by the unique obligations that apply to government lawyers—especially when those private lawyers are operating under a contingency-fee arrangement.  The financial incentives intrinsic to such arrangements create an overwhelming incentive to pursue a judgment or settlement in the government's favor—even if that outcome would be at odds with the public interest or impinge on the constitutional rights of regulated parties.  And here, where the State's baseless enforcement action against BMS and Sanofi for failing to make specific statements about Plavix itself constitutes and imposes continuing harm as a First Amendment violation, those incentives do not merely threaten fundamental constitutional rights—they impel contingency fee counsel to violate them.

## COUNT I

### (42 U.S.C. § 1983 - Violation of the First Amendment to the United States Constitution)

126.   The foregoing paragraphs are incorporated by reference as if set forth in full herein.

127.   The Free Speech Clause of the First Amendment of the United States Constitution provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I.  The Fourteenth Amendment of the United States Constitution makes this proscription applicable to the States and their political subdivisions.  *E.g.*, *NIFLA*, 138 S. Ct. at 2371.

128.   In addition to protecting against restrictions on speech, the First Amendment strictly limits the government's ability to compel individuals or entities to speak when they do not wish to do so.

129.   The State's action under the UDAP statute seeks, by means of massive punitive sanctions, to compel the Companies to provide specific warnings on the labeling for Plavix regarding genetic variability of response.

130.   The State seeks to recover these civil penalties even though it has not alleged—and contends it need not allege—that anyone actually suffered injury from Plavix.

131.   The warning that the State claims the Companies should have provided is neither factual nor uncontroversial, and is unduly burdensome and unjustified. Contrary to the State's proposed warning, there is no established link between genetic traits and clinical outcomes for patients using Plavix, and medical experts, professional associations, and regulatory agencies do not recommend routine genetic testing.

132.    The warnings that the State claims the Companies should have provided would have been inaccurate.

133.    At a minimum, the warnings that the State claims the Companies should have provided were the subject of active scientific debate during some of the period covered by this lawsuit, and conflicted with the overwhelming scientific consensus thereafter.

134.    The State's attempt to compel speech about genetic variability of response to Plavix is speaker-based, content-based, and viewpoint-based.

135.    Having conducted no serious investigation of Plavix, identified no medical concerns, and never contemplated this lawsuit before private lawyers presented it as a gift-wrapped package, the State lacked any legitimate sovereign interest in initiating a UDAP enforcement action against the Companies to compel them to warn on the labeling of Plavix that the drug is less effective for patients with certain genetic traits.  The State still lacks any legitimate sovereign interest in prosecuting the suit, particularly through private lawyers.

136.    The State's UDAP action is not narrowly tailored to serve a compelling government interest.

137.    The State's UDAP action does not directly advance a substantial government interest and burdens First Amendment rights more extensively than necessary to serve that interest.

51

138.   The State's UDAP action, with the prospect of hundreds of millions or billions of dollars in liability for engaging in truthful speech, chills the Companies and other pharmaceutical manufacturers from engaging in scientific debates about Plavix as well as about other products.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs Bristol-Myers Squibb Company, Sanofi-Aventis U.S. LLC, Sanofi US Services Inc., and Sanofi-Synthelabo LLC demand judgment against the State as follows:

a.    A declaration, pursuant to 28 U.S.C. § 2201, that the State's pursuit of a civil enforcement action against the Companies under Hawai`i's UDAP statute for alleged failure to warn about genetic variability of response to Plavix violates the First Amendment of the U.S. Constitution.

b.    In the event the Court does not enter the declaration requested above, a declaration, pursuant to 28 U.S.C. § 2201, that the State's initiation and prosecution of a civil enforcement action against the Companies under Hawai`i's UDAP statute for alleged failure to warn about genetic variability of response to Plavix, using private contingency fee counsel, violates the First Amendment of the U.S. Constitution.

c.    Preliminary and permanent injunctive relief prohibiting the State from pursuing a civil enforcement action against the Companies under

Hawai`i's UDAP statute for alleged failure to warn about genetic variability of response to Plavix.

d.      In the event the Court does not grant the injunctive relief requested above, preliminary and permanent injunctive relief prohibiting the State from using private contingency fee counsel to litigate its UDAP enforcement action against the Companies statute for alleged failure to warn about genetic variability of response to Plavix.

e.      All costs, attorneys' fees, and expenses that the Companies reasonably incur, *see* 42 U.S.C. § 1988.

f.      Such other and further relief as this Court deems just and proper.

DATED:  Honolulu, Hawai`i, January 7, 2020.

                                         /s/ PAUL ALSTON
                                         PAUL ALSTON
                                         LOUISE K. Y. ING
                                         ANAND AGNESHWAR
                                            (*Pro Hac Vice pending*)
                                         DANIEL PARISER (*Pro Hac Vice pending*)
                                         ROBERT N. WEINER (*Pro Hac Vice pending*)
                                         SALLY L. PEI (*Pro Hac Vice pending*)

                                         *Attorneys for Plaintiffs*

53