1              IN THE UNITED STATES DISTRICT COURT

2                  FOR THE DISTRICT OF HAWAII

3

4    BRISTOL-MYERS SQUIBB          )  CV 20-00010 JAO-RT
     COMPANY, et al.               )
5                                  )  Honolulu, Hawaii
                  Plaintiffs,      )  March 13,2020
6                                  )  9:04 a.m.
          vs.                      )
7                                  )  [33] MOTION TO DISMISS
     CLARE E. CONNORS, in her      )
8    capacity as the ATTORNEY      )
     GENERAL OF THE STATE OF       )
9    HAWAI'I,                      )
                  Defendant.       )
10   _____)

11

12                TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE JILL A. OTAKE
13              UNITED STATES DISTRICT JUDGE

14

     APPEARANCES:
15
     For the Plaintiffs:        PAUL ALSTON, ESQ.
16                              DENTONS US LLP
                                1001 Bishop Street, 18th Floor
17                              Honolulu, Hawaii 96813

18   (Via videoconference):     ANAND AGNESHWAR, ESQ.
                                Arnold & Porter Kaye Scholer LLP
19                              2550 West 55th Street
                                New York, New York 10019
20
                                SALLY L. PEI, ESQ.
21                              Arnold & Porter Kaye Scholer LLP
                                601 Massachusetts Avenue, NW
22                              Washington, D.C. 20001

23

24

25   (Continued)

```
 1   APPEARANCES (Continued):

 2   For the Defendant         THOMAS FRANCIS MANA MORIARTY, ESQ.
     Clare E. Connors,         State of Hawaii Attorney General
 3   in her capacity as        Commerce & Economic Development
     the Attorney General      425 Queen Street
 4   of the State of Hawaii:   Honolulu, Hawaii 96813

 5
     ALSO PRESENT:             JAMES PAIGE, Deputy Attorney General
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21   Official Court           ANN B. MATSUMOTO, RPR
     Reporter:                United States District Court
22                            300 Ala Moana Boulevard, C-338
                              Honolulu, Hawaii 96850
23

24
     Proceedings recorded by machine shorthand, transcript produced
25   with computer-aided transcription (CAT).
```

1   FRIDAY, MARCH 13, 2020                 9:04 O'CLOCK A.M.

2          COURTROOM MANAGER:  Civil Number 20-00010 JAO-RT,

3   Bristol-Myers Squibb Company, et al., versus Clare E. Connors.

4          This case has been called for a hearing on defendant

5   Clare E. Connors' motion to dismiss complaint.

6          Counsel, please make your appearances for the record.

7          MR. ALSTON:  Good morning, Your Honor.  Paul Alston

8   appearing for the plaintiffs.  In New York is my cocounsel, and

9   I'll let him introduce himself.

10         MR. AGNESHWAR:  Good morning, Your Honor.  My name is

11  Anand Agneshwar from Arnold & Porter for the plaintiffs.  With

12  me is my colleague Sally Pei and -- who is pro haced into the

13  case -- and also Anna Thompson, who is working with me and is

14  not pro haced into the case.  I would request Your Honor's

15  permission that she sit in the conference room with me.

16         THE COURT:  That's fine.  Welcome.

17         MR. AGNESHWAR:  Thank you.

18         Thank you, Your Honor.  And thank you very much for

19  the accommodation.  I really appreciate it.

20         THE COURT:  No problem.

21         MR. MORIARTY:  Good morning, Your Honor.  Mana

22  Moriarty on behalf of the defendant Clare E. Connors, Attorney

23  General of the State of Hawaii.  I'm joined by my colleague,

24  and I'll let him introduce himself.

25         MR. PAIGE:  Good morning, Your Honor.  Deputy

1  Attorney General James Paige, also for defendant Attorney
2  General Connors.
3          THE COURT:  Good morning, everyone.  You may be
4  seated.
5          MR. ALSTON:  One thing, Your Honor, before we begin
6  this morning, I provided the defendants and the court clerk a
7  small binder of materials that are already in the record, that
8  Mr. Agneshwar will be focusing on.  It's three cases and two
9  pieces of evidentiary material with the record cites provided
10  on the first page so that you can see that this is -- there's
11  nothing new here.  It's just simply things he wishes to focus
12  on in the argument.
13          THE COURT:  All right.  Thank you.
14          Everyone, you may be seated.
15          My intent this morning, counsel, is to allow both
16  sides ten minutes for oral argument.  If anybody thinks that
17  they need more time, if you could let me know that now, that
18  would be helpful.
19          Hearing no responses then, we will start off with
20  Ms. Connors' attorney for the motion to dismiss.  Thank you.
21          MR. MORIARTY:  Thank you, Your Honor.  Good morning.
22          THE COURT:  Good morning.
23          MR. MORIARTY:  The Plavix entities come before this
24  court and say that the state courts -- state's enforcement
25  action against the Plavix entities is all about money.  They

1  say that the Plavix entities are going to be so burdened by

2  astronomical civil penalties that have the potential to be

3  awarded against them as to be punitive in nature and a burden

4  on their First Amendment rights.

5          They're not wrong about the punitive aspect.  This is

6  a case about punishment and deterrence.  It's about deterring

7  the misconduct of corporate wrongdoers.

8          This case is about promoting respect for the law, and

9  it's a case that involves changing the behavior of a bloodless

10 and soulless corporation.  And what language does the

11 corporation speak?  They speak the language of profits and

12 losses.  That's the only thing they understand.

13         THE COURT:  Counsel, I don't think it's that helpful

14 for me this morning to hear arguments that might be better

15 suited for a jury.  So let's get to the law, if we could,

16 please.

17         MR. MORIARTY:  Yes, Your Honor.

18         THE COURT:  Yeah.

19         MR. MORIARTY:  The cases that we've cited in our

20 briefs clearly show that deterrence is an aspect of the civil

21 penalties tools.  The Hawaii legislature gave the Attorney

22 General tools to combat misdoing under the state's UDAP clause.

23 Those tools include the civil penalties remedy, which the

24 Hawaii legislature said was to deter misconduct.  The intent of

25 bringing a civil action to enforce the state's consumer

1    protection laws and seeking civil penalties is to deter and

2    punish.

3            And we want to promote respect for the law by saying

4    that people who -- corporations who violate the state's

5    consumer protection laws are going to be held accountable.  The

6    intent of this action is to vindicate the public interest

7    through that punishment and short of sending someone to jail,

8    which we obviously can't do this in action.  So they say it's

9    about money; they're not wrong, because the only action that

10   will help change their behavior is to impose civil penalties on

11   them.  The more money they have, and this is in the cases, the

12   greater their ability to pay.  This is the Daniel One case that

13   we cited in our reply brief.

14           The greater the ability to pay for the corporate

15   defendant, the greater the civil penalty has to be to have a

16   deterrent effect.  Now, I'm talking about deterring and

17   punishing misconduct.  Now, those are the same goals that

18   criminal prosecutors try to obtain in criminal prosecutions

19   against -- against criminal defendants.

20           THE COURT:  If you could hold on for a moment,

21   Mr. Moriarty.  I'm hearing a little bit of background noise,

22   and I'm wondering if that --

23           Ms. Mizukami, can you tell where that background

24   noise is coming from?

25           MR. AGNESHWAR:  Your Honor, it may have been papers

1    here.  I'm going to mute myself while the state is arguing.

2    Maybe that'll be the better course.

3              THE COURT:  Yes.  Please.  Thank you.  Go ahead.

4              MR. MORIARTY:  Thank you.

5              And I was talking about the deterrent effect and the

6    ability to pay.  The question of how much a corporate defendant

7    has to pay in a civil enforcement action depends on how big the

8    corporation is, how to deter their misconduct.  These are

9    corporate defendants that sent -- recently sent nine attorneys

10   to a summary judgment hearing in state court.  These defendants

11   are well-heeled.  So in order to get them to be accountable for

12   consumer protection violations, we've got to hit them where it

13   hurts.

14             It's clear, based on the goals of our state court

15   action, which align with criminal cases, and the goals of

16   criminal cases, that this is a quasi-criminal action that falls

17   squarely under Younger.  That's the question posed by this

18   motion.  The rest of the arguments, the rest of the NOPSI test,

19   the Middlesex test, will fall squarely in line because there's

20   no dispute about the elements of the Middlesex test and whether

21   there's an extraordinary circumstance here.

22             And I want to say that Judge Kay got it exactly right

23   in the State Farm case.

24             THE COURT:  How do you respond to plaintiffs'

25   argument that State Farm is outdated in the sense that it

1    predated Sprint and therefore shouldn't apply here?

2         MR. MORIARTY:  The holding of -- of the State Farm

3    case is that this is a quasi-criminal action because it imposes

4    civil penalties.  It's a consumer protection action that

5    imposes civil penalties, and it's on all fours with the action

6    we're here to discuss.

7         There's no -- there's no dispute that a

8    quasi-criminal action is one that meets the NOPSI first

9    prong -- the second NOPSI factor, the second NOPSI factor being

10   whether the case is a quasi-criminal enforcement action.  I

11   mean the holding is squarely on point.  If they're saying that

12   the cases have evolved since then, where is the case?  I mean

13   they're just looking at NOPSI and the second factor of the NOP

14   -- the second NOPSI category and saying this doesn't fit, and

15   the cases have evolved, without support.

16        They're not pointing to a specific case that says

17   that a quasi-criminal action in 1995 is no longer a

18   quasi-criminal action in 2020.

19        And Judge Kay's point in the State Farm case was we

20   look at the nature of the case.  We don't look to the merits of

21   the case.  The merits of the case are what we've been

22   litigating in state court for six years.

23        Now, defendants in the state -- in the state court

24   action on Monday this week filed a motion for summary judgment,

25   on Friday last week filed a motion for summary judgment.  I'll

 1   get back to those later, and I'm happy to introduce those into

 2   the record if Your Honor would like.

 3            THE COURT:  Let me ask a question about that.  So --

 4            MR. MORIARTY:  Sure.

 5            THE COURT:  -- in Cook versus Harding, 879 F.3d 1035,

 6   2018, the Ninth Circuit said at page 1041, "We may not consider

 7   events after the filing of the complaint for purposes of our

 8   Younger analysis."

 9            And I was curious to know your take on that

10   statement.  Because it does seem that there are points in your

11   briefing where you do refer to events that happened in the case

12   after the filing of this complaint in this case, the events

13   that happened in the state case after this case was filed.

14            And so I had read that in the Cook case and wasn't

15   certain what your position would be on that statement.

16            Again, the quote is:  "We may not consider events

17   after the filing of the complaint for purposes of our Younger

18   analysis," in the Cook case.

19            MR. MORIARTY:  Thank you for pointing that out.

20            If that's the -- if that's the Ninth Circuit's ruling

21   in the -- in the Cook case, then we see no reason to belabor

22   the point that we cannot consider events afterwards, although I

23   think that judicial notice is appropriate in this case for

24   facts that are beyond dispute.  I would say that --

25            THE COURT:  Why would I take judicial notice of

1  something that I can't consider?  I mean, I'm not saying I can

2  or can't.  But one, I think --

3          MR. MORIARTY:  Sure.

4          THE COURT:  -- obvious interpretation of this

5  sentence is that I can't.

6          MR. MORIARTY:  Sure.  Sure.  And I don't think it

7  goes that far, right?  It doesn't go that far to take -- as to

8  say that facts that are indisputable and that the parties

9  cannot reasonably deny are incapable of being presented to the

10  court as part of the analysis.

11          But I understand reasonable minds could differ on

12  that particular point.  Yeah.

13          THE COURT:  You have about one minute left, counsel.

14  Little bit over a minute.

15          MR. MORIARTY:  Thank you.

16          I want to -- I want to address the outside sources

17  argument that the -- that the Plavix entities raise.  And I

18  want to -- that's the argument that the -- the AG may not rely

19  on outside sources of information when they bring an

20  investigation or bring an enforcement action.  And if that was

21  the case, it would simply be a penalty on a small state like

22  Hawaii, that has not endless resources to address consumer

23  protection violations and has to bring the violations as a

24  matter of law when it sees the violations.

25          There's no case that requires that the source of the

1   information about a UDAP violation come from within the

2   Attorney General's office.

3           I want to address the money-grubbing lawyers argument

4   in the remaining time that I have, and that's the argument that

5   the AG is represented by contingency fee lawyers.  And what?

6   The AG has the right to be represented by contingency fee

7   lawyers.  That right is imbued by statutory law.  The name on

8   the caption is "State of Hawaii," and four attorney generals

9   (sic) have either approved or maintained this action.  They are

10  ready to see it through to trial, a trial scheduled to begin on

11  May 5th in the state court.

12          That action is not the action taken without the

13  approval of the attorney generals (sic).  The private attorneys

14  could not bring this case on their own.  These are four

15  attorneys generals (sic) who've approved this.  And who are the

16  defendants in the state court case, Plavix entities, plaintiffs

17  here, to question the motives of the attorney generals (sic) in

18  bringing the case?  The attorney generals (sic) who found that

19  this case is in the public interest.

20          THE COURT:  All right.  Thank you, counsel.  Your

21  time is up.

22          I will give you an extra minute for rebuttal if you

23  feel --

24          MR. MORIARTY:  Thank you, Your Honor.

25          THE COURT:  -- you need it.

1              And to be fair, Mr. Agneshwar, I will give you 11

2    minutes as a result, since I'm giving them an extra minute now.

3              MR. AGNESHWAR:  Thank you, Your Honor.

4              Anand Agneshwar, Arnold & Porter, for the plaintiffs.

5              On the Metcalf question that Your Honor asked, if you

6    look at Metcalf -- and I'm looking at page 2 of the printout --

7    it says quite clearly that in the factors they're discussing,

8    they're going through the Middlesex factors, including

9    Middlesex Factor 2, the proceedings implicate important state

10   interests.  And if you go to the section that the state's

11   counsel was referencing, it's all about that factor.

12             And those factors are outdated after the Sprint case.

13   Your Honor recognized in a recent case, actually, that Sprint

14   changed the law here.

15             Sprint didn't just change the law; it was a paradigm

16   shift.  Those three factors are still relevant, but only if the

17   Court finds that abstention is appropriate under one of the

18   three criteria that the Sprint case articulated, and the one

19   that's relevant here is quasi-criminal prosecution.

20             THE COURT:  Mr. --

21             MR. AGNESHWAR:  I think --

22             THE COURT:  I'm sorry, Mr. Agneshwar, if I could --

23   you're kind of going back and forth like this.

24             MR. AGNESHWAR:  Oh, sorry.

25             THE COURT:  And it's causing a little bit of

1    distortion.

2              MR. AGNESHWAR:  I'm sorry.

3              THE COURT:  So if you could just stand still, if you

4    don't mind, it will make it easier for us to hear you.  Okay.

5              MR. AGNESHWAR:  I will do my best, Your Honor.  It's

6    not easy doing -- this is my first video.  I'll do my best.

7              THE COURT:  All right.  I'm sorry.  Go ahead.

8              MR. AGNESHWAR:  So the Sprint -- Sprint was a

9    paradigm shift.  And it said, at the end of the decision, those

10   factors may be relevant if abstention is appropriate as

11   additional reasons why you should not abstain.  But you start

12   out looking at this very skeptically about abstention.  The

13   court said it's -- the federal court has an unflagging

14   obligation to hear court cases before it except in

15   extraordinary circumstances.  And that's where we get to what

16   the Sprint court meant by quasi-criminal prosecution.

17             We know from the way Justice Ginsburg analyzed the

18   issue that she was not looking at a formalistic way of

19   analyzing it, where you just look:  Is the state bringing an

20   enforcement action?  That may be how you look at important

21   state interests under the three flexible Middlestate (sic)

22   factors.  But it's not how you look at quasi-criminal under

23   Sprint.

24             In fact, Justice Ginsburg went on to say you look at

25   things like does this have -- you want to answer:  Does this

1   have the character of a criminal prosecution?  And you look at

2   factors like:  Did the state do an investigation?  Was this

3   initiated by the state?  Was it really intended to prosecute

4   wrongdoing?

5           THE COURT:  Counsel, let me ask you a question.  Let

6   me ask you a question regarding Sprint.

7           Why isn't this case, or the state case, clearly

8   distinguishable from Sprint in the sense that Sprint, in Sprint

9   that matter was not initiated by a state in its sovereign

10  capacity, and it was not initiated to sanction a federal

11  plaintiff?

12          I mean the facts of Sprint are somewhat unique and I

13  think distinguishable from this case, but tell me why I'm

14  wrong.

15          MR. AGNESHWAR:  Well, I think the facts of that case

16  are distinguishable, but I think the principles and the way

17  Justice Ginsburg analyzed the situation is very similar.

18          Just like here, in Sprint, the utilities board was

19  arguing that even though it didn't initiate the action, it

20  really was an enforcement action using its enforcement

21  authority under the statute.

22          And Justice Ginsburg looked at the record and looked

23  at the facts to say no.

24          And why does that apply here?  It's not exactly the

25  same facts.  But here, the state did not initiate this lawsuit.

1   There were no complaints about Plavix in the state, no evidence

2   of any harm in the state.  This was brought to the state by

3   private mainland lawyers who are product -- had product

4   liability cases.  And so while the state became a party, it

5   didn't initiate that.

6            And on that point as well, under that factor that

7   Justice Ginsburg says that the court should consider, it's not

8   just whether who -- whether the state is a party; it's also

9   whether it initiated it.  And I think that's interesting

10  because it distinguishes between whether the state is just a

11  plaintiff, as the state's arguing here, or whether they

12  actually initiated it.

13            THE COURT:  Do you have -- counsel, do you have any

14  case law that supports your argument that where private counsel

15  represents the state in the fashion that you allege here that

16  such behavior establishes that the suit is really -- amounts to

17  one between private parties?  I mean that's kind of your --

18            MR. AGNESHWAR:  Well --

19            THE COURT:  -- argument, right?  Is that -- the verb

20  here is "initiate," but what you're saying is that the private

21  counsel brought this to the state.  The state, you acknowledge,

22  is the primary plaintiff.

23            But where in the case law does it suggest that this

24  sort of relationship between private counsel and the state

25  therefore establishes that the -- or creates a situation where

1   the suit is one between private parties as opposed to quasi --

2            MR. AGNESHWAR:  Well, I'm not --

3            THE COURT:  -- as opposed to a quasi-criminal action?

4            MR. AGNESHWAR:  Right.  I understand the question,

5   Your Honor.

6            I think there's two answers to that question.  Number

7   one is:  If this was really a criminal-type prosecution, the

8   state could not use contingency fee lawyers.  A prosecutor, as

9   Your Honor knows, cannot have a financial interest in the

10  outcome of a litigation.

11           The second answer to the question is I would put it a

12  different way.  I would look at what the precedent teaches us

13  about when you get within the purview of Sprint.

14           And if you look at every case that the Sprint case

15  cited with approval in finding abstention, every one of them

16  involved the state identifying the problem within the state,

17  doing an investigation, and initiating the prosecution.  And

18  none of them involved outside private parties approaching the

19  state.

20           And the cases that I'm talking about, Your Honor, are

21  Moore -- that was a child abuse case -- the state began

22  investigation of the child abuse; the Trainor case, the state

23  began an investigation into welfare fraud; the Dayton case, the

24  state began an investigation into discrimination; and the

25  Huffman case, which was actually brought by prosecuting

1    attorneys and the sheriff as an analogue to a criminal

2    prosecution.

3              THE COURT:  But --

4              MR. AGNESHWAR:  What I think --

5              THE COURT:  But are you acknowledging, then, that you

6    don't have any case law that explicitly says that the

7    relationship here, between private counsel and the state,

8    precludes a conclusion that this state action was an action

9    initiated by the state?

10             MR. AGNESHWAR:  I don't have a case saying exactly

11   that.  And I don't think I'm arguing that far, Your Honor.  I

12   think -- I hear what the state is saying about its resources,

13   and I recognize that Hawaii has a statute that permits them in

14   certain circumstances to retain outside counsel to prosecute

15   UDAP actions.

16             And if this was a case where there were complaints

17   within the state, where the state began an investigation and

18   then decided they needed to file a lawsuit and retained outside

19   counsel, I think you'd have a different balancing in that

20   circumstance.  And perhaps even the state could meet the -- the

21   criteria of quasi-criminal prosecution.

22             But when you look at all the factors as a whole here,

23   Your Honor, there is -- and there's -- there was the state

24   put -- even though they styled this a 12(b)(1) motion, they put

25   no evidence in, so the allegations of the complaint must be

1    taken as true.

2          We have no evidence of any wrongdoing in the state.

3    Even the expert reports the state put in do not include any

4    evidence of any harm, any evidence of any investigation, any

5    evidence that this was intended by the state to be an

6    identification of wrongdoing and a quasi-prosecution as a

7    result.

8          There is zero evidence about that, Your Honor.  And

9    if you look at every case, including the Metcalf case that the

10   state relies on, even though it was pre-Sprint and even though

11   it was analyzing a different prong, it was still a situation

12   where the insurance department of their own accord identified a

13   wrong and then did something to stop it.

14             THE COURT:  But, counsel --

15             MR. AGNESHWAR:  I submit, Your Honor --

16             THE COURT:  Okay, counsel, if we could turn to the

17   point of important state interests here.  And under NOPSI, at

18   page 365, the Supreme Court plainly stated, quote, "When we

19   inquire into the substantiality of the state's interest in its

20   proceedings, we do not look narrowly to its interest in the

21   outcome of the particular case -- rather, what we look to is

22   the importance of the generic proceedings to the state."

23             So why shouldn't I evaluate this question of

24   important state interests as to whether or not the state has an

25   interest in protecting the health and safety of its citizens?

1          MR. AGNESHWAR:  I think, Your Honor, on the -- on the

2    specific Middlesex prong of important state interest that comes

3    into play only if the Court finds there's a quasi-criminal

4    prosecution under Sprint, I agree.  NOPSI actually uses that

5    language of -- of you look generically.  That's what the

6    Metcalf case does too.  I really can't argue with that.

7          If Your Honor doesn't buy my argument about this not

8    being a quasi-criminal prosecution, I think the case law's

9    against me on important state interests.

10         THE COURT:  All right.  Let's turn then to

11   extraordinary circumstances that preclude Younger abstention.

12         Are you at all arguing a bad faith exception here?

13         MR. AGNESHWAR:  We -- we haven't -- I -- I don't --

14         No, Your Honor, I'm not actually arguing bad faith.

15   I am arguing, though, that it doesn't -- that it does not have

16   the character of an appropriate state action.  This is also an

17   action that actually is contrary to the public health of the

18   citizens of Hawaii.  And it's an action that is such a breach

19   of the First Amendment in this case, where we are being

20   penalized for taking a particular side of a scientific debate.

21   And I'm asking Your Honor for that prong -- and again, that

22   only comes into play if the Court finds the quasi-criminal

23   prosecution prong satisfied.

24         THE COURT:  Right.

25         MR. AGNESHWAR:  I'm asking the Court to look at the

1   totality of what we allege in the complaint, the -- the

2   contrariness to public health, and find that -- use your

3   discretion to find in favor of Justice Ginsburg's presumption

4   in favor of exercising federal jurisdiction, that this is a

5   unique case that we should keep.

6           THE COURT:  All right.  Thank you, very much,

7   counsel.

8           MR. AGNESHWAR:  Thank you, Your Honor.

9           THE COURT:  Mr. Moriarty.

10          MR. MORIARTY:  Thank you, Your Honor.

11          A quick few points in my rebuttal time.  First, the

12  AG has no pecuniary interest in this particular state court

13  enforcement action.  That should be clear.

14          Second, with respect to the state-initiated action

15  that Mr. Agneshwar was addressing, I'd point the Court to

16  Merck, which involved contingency fee counsel retained by the

17  state of Kentucky to represent it.  And in Merck, 909 F.Supp.

18  2d 781, the court found that the fact that contingency fee

19  counsel was representing the state of Kentucky was not relevant

20  to the Younger analysis.

21          Clearly Mr. Agneshwar is interested -- this is my

22  third point, Your Honor -- in getting into the merits of the

23  state's action or inaction, for example, by its public health

24  entities.  And those are defenses, let's be clear, in the

25  underlying state court case.

1        He's interested in getting into the merits of the

2  case.  We need to focus on the nature of the case, which is

3  the -- the focused question presented by our motion to dismiss.

4        And he's conceded that there's no case saying that a

5  state-initiated action cannot be brought by contingency

6  counsel -- I'm going back.

7        If Your Honor is -- my last point, Your Honor, is if

8  you're inclined to look beyond Cook and allow evidence of new

9  developments in the case below, the Monday summary judgment --

10 in the Monday summary judgment motion the defendants argued the

11 Eighth Amendment and the Fourteenth Amendment.  They didn't

12 argue the First Amendment.

13       They argued that the Eighth Amendment excessive fines

14 clause prohibits the state's civil penalties methodology.  They

15 argued the Fourteenth Amendment due process clause prohibits

16 the state's civil penalties methodology.  They did not raise a

17 First Amendment argument there, and they have not raised it

18 throughout any of the proceedings in the state court.

19       THE COURT:  All right.  Thank you, counsel.

20       Counsel, both --

21       MR. AGNESHWAR:  Your Honor, can I just have 45

22 seconds --

23       THE COURT:  Sure.

24       MR. AGNESHWAR:  -- to respond to that?

25       THE COURT:  Yes.

1        MR. AGNESHWAR:  Okay.  So the Merck case actually,

2  again, makes my point, as well as the -- the two press releases

3  that the state cited in its -- in its brief.

4        The Merck case was a piggyback onto major actions by

5  the federal government and by state governments across the

6  country with investigations, just like the Juul case, just like

7  the -- the Volkswagen case that they cite.  So there are --

8  this is not going to cut the legs out from under the state if

9  the Court declines to abstain here.  There's a lot of actions

10  in the state where they have done investigations, just like

11  Merck, or they can follow on other state government

12  investigations.  And I submit that it would be a brand-new

13  precedent to hold that an action really initiated by private

14  counsel suddenly falls within the doctrine of abstention.

15        Thank you, Your Honor.

16        THE COURT:  All right.  Thank you.  Thank you, both.

17        You know, I wanted to commend the parties on how well

18  written the briefs are in this case.  This is not something I

19  have had the ability to consistently enjoy yet on my time on

20  the bench.  And so I very much appreciate the quality of the

21  briefing by both parties in this case.

22        We will -- we know that you folks are in a very

23  sensitive spot in terms of your state trial.  So we will

24  endeavor to issue an order quickly, hopefully no later than

25  next week Tuesday.  All right.

1              MR. MORIARTY:  Your Honor, briefly?

2              THE COURT:  Yes.

3              MR. MORIARTY:  If the Court is not inclined to grant

4    the motion to dismiss, I understand that the defendants are --

5    the Plavix entities are seeking to continue the state court

6    trial.

7              Now, if they continue the state court trial beyond

8    the date of our scheduled preliminary injunction motion,

9    defendants are obviously going to have a tactical advantage

10   because the preliminary injunction motion is going to go before

11   our trial.  We want to raise that point.

12             And if we are not going to win on the motion to

13   dismiss, then we'd be inclined to seek a status conference to

14   reschedule the preliminary injunction till after the state

15   court trial.  Thank you.

16             THE COURT:  All right.  I'm so noted.

17             All right.  Thank you.

18             MR. AGNESHWAR:  Your Honor, just so I can clarify,

19   the reason for our request for the continuance is that we're --

20   it's because of the coronavirus.

21             THE COURT:  I --

22             MR. AGNESHWAR:  We're in a tough situation.  And some

23   of our witnesses are overseas.  You can't travel from Europe

24   here.  That's the reason for it.  And in any event, I don't

25   think there's any bar with the Rooker-Feldman doctrine if the

1  state court case goes first.  And -- but we can deal with that

2  if it comes to pass.

3          THE COURT:  I suspected that the state court trial

4  might run into some problems because of the coronavirus

5  doctrine.  But thankfully, that's not my concern at this point.

6          All right, counsel, thank you again for the argument.

7  We are adjourned.

8          MR. MORIARTY:  Thank you.

9          MR. AGNESHWAR:  Thank you, Your Honor.

10          (The proceedings concluded at 9:32 a.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                      COURT REPORTER'S CERTIFICATE

2              I, Ann B. Matsumoto, Official Court Reporter, United

3    States District Court, District of Hawaii, do hereby certify

4    that pursuant to 28 U.S.C. Sec. 753 the foregoing is a

5    complete, true, and correct transcript of the stenographically

6    recorded proceedings held in the above-entitled matter and that

7    the transcript page format is in conformance with the

8    regulations of the Judicial Conference of the United States.

9              DATED at Honolulu, Hawaii, March 30, 2020.

10

11

12
                          _/s/ Ann B. Matsumoto_____
13                        ANN B. MATSUMOTO, RPR

14

15

16

17

18

19

20

21

22

23

24

25